# ROGERS TOWNSEND
## ATTORNEYS AT LAW

tel  803-744-4444
fax  803-343-7017
web  www.rtt-law.com

PO Box 100200
Columbia, South Carolina  29202

Dated:     September 12, 2018

Ruth Anne Torchia
11 Hunt Cup Lane
Camden, SC 29020

Jason T. Moss, Esquire
Moss & Associates, Attorneys, P.A.
816 Elmwood Avenue
Columbia, SC  29201

Pamela Simmons-Beasley
Chapter 13 Trustee
250 Berryhill Road, Suite 402
Columbia, SC 29210

Nicholas Torchia
40 Market Street, Apt 605
Newton, NJ 07860

Re:     U.S. Bank Trust National Association, as Trustee of the Igloo Series III Trust vs. Ruth
        Anne Torchia aka Ruth A Torchia aka Ruth Torchia aka Ruth Williams Torchia
        Chapter 13 Case No. 17-01098-dd

Dear Sir/Madam:

In reference to the above styled matter, enclosed please find one copy of the Notice of
Motion Seeking 11 U.S.C § 362 Relief, Notice of Motion/Application and Opportunity for
Hearing, Motion to Modify Stay, Motion to Modify Stay as to Co-Debtor and Certification of
Facts.  These documents are hereby served upon you.

Sincerely,

/s/  Lori Qualls
Lori Qualls
Bankruptcy Paralegal

Enclosures

cc:     BSI Financial Services, Inc.

**United States Bankruptcy Court**
**District of South Carolina (Columbia)**

| | |
|---|---|
| IN RE:<br><br>Ruth Anne Torchia<br>*aka Ruth A Torchia*<br>*aka Ruth Torchia*<br>*aka Ruth Williams Torchia*,<br>Debtor(s). | CHAPTER 13<br>CASE NO.: 17-01098-dd<br><br>NOTICE OF MOTION SEEKING<br>RELIEF FROM AUTOMATIC STAY<br>11 U.S.C. §362(d) RELIEF |

**TO:  DEBTOR, TRUSTEE (if applicable), AND THOSE NAMED IN THE ATTACHED MOTION**

PLEASE TAKE NOTICE THAT a hearing will be held on the attached Motion.

Date:  <u>October 29, 2018</u>

Time:  <u>2:00 P.M.</u>

Place:  J. Bratton Davis U.S. Bankruptcy Courthouse, 1100 Laurel Street, Columbia, SC 29201

Within fourteen (14) days after service of the attached motion, the notice of motion, the movant's certification of facts, (and a blank certification of facts form, applicable only to motions for relief from the automatic stay and for service on *pro se* parties only), any party objecting to the relief sought shall:

(1) File with the Court a written objection to the 11 U.S.C. § 362 Motion;

(2) File with the Court a certification of facts (for motions for relief from the automatic stay);

(3) Serve on the movant items 1 and 2 above at the address shown below; and

(4) File a certificate of such service with the Court.

If you fail to comply with this procedure, you may be denied the opportunity to appear and be heard on this proceeding before the Court.

Date:  September 12, 2018

<u>/s/ Jason D. Wyman</u>
John J. Hearn (I.D. 6494)
Jason D. Wyman (I.D. 11294)
Kevin T. Brown (I.D. 5801)
Attorneys for Movant
Rogers Townsend & Thomas, PC
Post Office Box 100200
Columbia, South Carolina 29202
(803) 744-4444

**United States Bankruptcy Court**
**District of South Carolina (Columbia)**

IN RE:

Ruth Anne Torchia
*aka Ruth A Torchia*
*aka Ruth Torchia*
*aka Ruth Williams Torchia,*

Debtor(s).

CHAPTER 13
CASE NO.: 17-01098-dd

<u>MOTION TO MODIFY STAY</u>

U.S. Bank Trust National Association, as Trustee of the Igloo Series III Trust ("Movant")

hereby moves this Court pursuant to 11 U.S.C. § 362, for relief from the automatic stay, or in the

alternative for adequate protection, with respect to certain real property of the Debtor(s) having

an address of 11 Hunt Cup Lane, Camden, 29020 (the "Property"). The facts and circumstances

supporting this Motion are set forth in the Certification of Facts filed contemporaneously

herewith. In further support of this Motion, Movant respectfully states:

1.      Debtor filed a Petition for Relief under Chapter 13 of the United States

Bankruptcy Code on March 6, 2017.

2.      The Trustee of the Debtor's estate may claim an interest in the property which is

the subject of this action.

3.      Movant is the holder of a secured claim against the Debtor.

4.      Debtor's Confirmed Plan, ECF Doc No. 14, provided that she would seek loss

mitigation in order to cure the arrears owed to the Movant. The Confirmed Plan specifically

provided that:

> Debtor(s) will seek loss mitigation/mortgage modification on the mortgage loan
> secured by Debtor's Residence-11 Hunt Cup Lane, Camden SC 29020. No
> payment will be made by the Trustee on this secured claim. If a loan modification
> request is not approved within 120 days of the entry of an order lifting the stay to
> allow loss mitigation, then the stay may be lifted on Debtors Residence – 11 Hunt
> Cup Lane, Camden SC 29020 and the creditor may send any required notice to

Debtor(s) and proceed with its remedies against the collateral.

5.    To date, the Debtor has failed to abide by the terms of her Confirmed Plan and has not requested an Order Authorizing Loss Mitigation.  Movant is not adequately protected while the Debtor continues to use and occupy the Property without remitting a single post-petition payment.  Post-petition payments have not been made pursuant to the terms of the note, mortgage, loan modification and chapter 13 plan, resulting in missed post-petition payments totaling $34,248.78 through the September 2018 payment.  In addition, Debtor is responsible for the pre-petition arrears per the terms of her Chapter 13 plan.

6.    Movant has a valid security interest in the property described in that certain mortgage dated July 21, 2003 and recorded July 28, 2003, in the Office of the Register of Deeds for Kershaw County in Book 1401 at Page 216 in the original principal sum of $300,000.00.  A copy of the Note, Mortgage and applicable Assignment(s), and Loan Modification Agreement are attached to the Movant's Certification of Facts.

7.    The interest of Movant with respect to the mortgaged premises continues to worsen and is not adequately protected while a large indebtedness remains upon this account.

8.    According to the Note and Mortgage, Movant's attorney is entitled to a reasonable fee and reimbursement of costs for the prosecution of this action.

9.    Pursuant to 11 U.S.C. § 362(d)(1), Movant believes it is entitled to an order modifying the automatic stay heretofore entered to the extent necessary to allow Movant to pursue its state law remedies including, but not limited to, sending required notices, initiating or continuing foreclosure and/or eviction proceedings as to the subject property, and/or at Movant's option, pursuing loss mitigation if available.

10.    The Movant agrees to waive any claim that may arise under 11 U.S.C. § 503(b) or

§ 507(b) as a result of this Motion. The Movant further agrees that any funds realized from the

foreclosure sale, in excess of all liens, costs, and expenses, will be paid to the trustee.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the

stay and granting the following:

1.    Relief from the stay for all purposes allowed by the Note, the Mortgage, and

applicable law, including but not limited allowing Movant (and any successors or assigns) to

proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and

obtain possession of the Property.

2.    That Movant be entitled to recover its reasonable fees and expenses incurred in

connection with seeking the relief requested in this Motion.

3.    For such other relief as the Court deems proper.


/s/ Jason D. Wyman
John J. Hearn (I.D. 6494)
Jason D. Wyman (I.D. 11294)
Kevin T. Brown (I.D. 5801)
Attorneys for Movant
Rogers Townsend & Thomas, PC
Post Office Box 100200
Columbia, South Carolina 29202
(803) 744-4444

Columbia, South Carolina
Dated:   September 12, 2018

**United States Bankruptcy Court**
**District of South Carolina (Columbia)**

IN RE:

Ruth Anne Torchia
*aka Ruth A Torchia*
*aka Ruth Torchia*
*aka Ruth Williams Torchia,*

                                        Debtor(s).

CASE NO.: 17-01098-dd

CHAPTER 13

CERTIFICATION OF FACTS

In the above-entitled proceeding, in which relief is sought by U.S. Bank Trust National Association, as Trustee of the Igloo Series III Trust from the automatic stay provided by 11 U.S.C § 362, I do hereby certify to the best of my knowledge the following:

1. Nature of Movant's Interest:
   Secured Creditor.

2. Brief Description of Security Agreement, copy attached  (if applicable):
   True and correct copies of the Note and Mortgage, and applicable Assignment(s) are attached hereto as Exhibits A, B and C, respectively, and incorporated herein by reference.  A true and correct copy of the Loan Modification Agreement is attached hereto and incorporated herein by reference as Exhibit D.

3. Description of Property Encumbered by Stay (Include serial number, lot and block number, etc.):
   The property located at 11 Hunt Cup Lane, Camden in Kershaw County, South Carolina 29020 - TMS# C257-15-0A-006-S76, as is more fully described in the mortgage, a copy of which is attached.

4. Basis for Relief (property not necessary for reorganization, debtor has no equity, property not property of estate, etc.; include applicable subsection of 11 U.S.C § 362):
   11 U.S.C. §362(d)(1)

5. Prior Adjudication of Other Courts, copy attached, (Decree of foreclosure, Order of possession, Levy of execution, etc., if applicable):
   N/A

6. Valuation of Property, copy of valuation attached (Appraisal, Blue Book, etc.):

   Fair Market Value    $450,000.00    Movant reserves the right to provide an appraisal if needed

   Senior Liens              $0.00

   Movant's Lien:        $267,923.53    Movant's Payoff $267,923.53 as of September 11, 2018

   Other Liens:              $0.00

   Net Equity           $182,076.47

   Source/Basis of Value        Debtor's Schedules

7. Amount of debtor's estimated equity (using figures from paragraph 6, supra):
   $182,076.47

8. Month and Year in Which First Direct Post-petition Payment Came Due to Movant (if applicable):
   April, 2017

9. (a) For Movant/Lienholder (if applicable): List or attach a list of all Post-petition payments received directly from debtor(s), clearly showing date received, amount, and month and year for which each such payment was applied
N/A. No Post Petition Payments have been received from the Debtor.

(b) For Objecting Party (if applicable): List or attach a list of all Post-petition payments included in the Movant's list from (a) above which objecting party disputes as having been made. Attach written proof of such payment(s) or a statement as to why such proof is not available at the time of filing this objection:

10. Month and Year for Which Post-petition Account of Debtor(s) is Due as of the Date of this Motion:
April, 2017.

/s/ Jason D. Wyman
John J. Hearn (I.D. 6494)
Jason D. Wyman (I.D. 11294)
Kevin T. Brown (I.D. 5801)
Attorney for Movant
Post Office Box 100200
Columbia, SC  29202-3200
(803) 744-4444

Dated:    September 12, 2018

**United States Bankruptcy Court**
**District of South Carolina (Columbia)**

IN RE:

Ruth Anne Torchia
*aka Ruth A Torchia*
*aka Ruth Torchia*
*aka Ruth Williams Torchia,*

Debtor(s).

CHAPTER 13
CASE NO.: 17-01098-dd

CERTIFICATE OF SERVICE

     I, the undersigned employee of ROGERS TOWNSEND & THOMAS, PC, do hereby

certify a copy of the Notice of Motion Seeking Relief, Notice of Motion/Application and

Opportunity for Hearing, Motion to Modify Stay, Motion to Modify Stay as to Co-Debtor and

Certification of Facts was mailed to the parties listed below:

Ruth Anne Torchia
11 Hunt Cup Lane
Camden, SC 29020

Jason T. Moss, Esquire
Moss & Associates, Attorneys, P.A.
816 Elmwood Avenue
Columbia, SC 29201

Pamela Simmons-Beasley
Chapter 13 Trustee
250 Berryhill Road, Suite 402
Columbia, SC 29210

Nicholas Torchia
40 Market Street, Apt 605
Newton, NJ 07860

                    /s/ Lori Qualls
                    ROGERS TOWNSEND & THOMAS, PC
                    Lori Qualls, Bankruptcy Paralegal
                    Post Office Box 100200
                    Columbia, SC 29202-3200
                    (803) 744-4444

Columbia, South Carolina
Dated:  September 12, 2018

EXHIBIT A

Loan Number

## <u>LOST NOTE AFFIDAVIT</u>

PERSONALLY appeared before me, ____  ____ (the "Affiant"), who, upon being duly sworn, states on his/her oath as follows:

1.  Affiant is a **Vice President Loan Documentation** employed by **WELLS FARGO BANK, N.A.,** ("Wells Fargo"), **SERVICER** in the above-captioned matter.

2.  I am authorized to make this Affidavit on behalf of Wells Fargo. In the regular performance of my job functions, I am familiar with business records maintained by Wells Fargo for the purpose of servicing mortgage loans and I have personal knowledge of the operation of and the circumstances surrounding the preparation, maintenance, and retrieval of records in Wells Fargo's record keeping systems. These records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of business activity conducted regularly by Wells Fargo. It is the regular practice of Wells Fargo's mortgage servicing business to make these records.

3.  On **JULY 21, 2003**, **NICHOLAS TORCHIA AND RUTH TORCHIA** executed and delivered to **SOUTHTRUST MORTGAGE CORPORATION** a certain Note. The Note was secured by a Mortgage executed by **NICHOLAS TORCHIA AND RUTH TORCHIA**, the record owner of the property located at **11 HUNT CUP LANE, CAMDEN, SOUTH CAROLINA 29020**, dated **JULY 21, 2003**, and recorded on **JULY 28, 2003** in **KERSHAW** COUNTY SOUTH CAROLINA **in or as INSTRUMENT #: 000008899, BOOK 01401 AND PAGE 00216.**

4.  The subject **NOTE** has been inadvertently lost, misplaced or destroyed. Affiant states that **Wells Fargo** has not pledged, assigned, transferred, hypothecated or otherwise disposed of the **NOTE**.

5.    **Wells Fargo** has made a diligent and extensive search of its records in a good faith effort to discover the lost **NOTE** in accordance with its procedures for locating the lost **NOTE**, without success.

   a.    The following areas were searched for the lost **NOTE**:

      i.    Reviewed origination file

      ii.    Checked internal Wells Fargo vault

      iii.    Checked with Custodian

      iv.    Checked box storage records

      v.    No current and/or prior attorney to check.

6.    **WELLS FARGO BANK, NA** ("Plaintiff") is entitled to enforce the lost **NOTE** because Plaintiff was in possession of the instrument and entitled to enforce it when loss of possession occurred.  Affiant further states:

   a.    Affiant has knowledge that **Wells Fargo** is the present owner and holder of the **NOTE**, even though it has been lost.

   b.    Affiant has knowledge that the **NOTE** has not been sold or transferred and the **Wells Fargo** has not relinquished their right, title and interest in them to any person or entity.

   c.    Affiant has knowledge that the time and manner of the loss is some unknown time from the date of the receipt thereof to the date of this Affidavit.

7.    A copy of subject Note is attached as Exhibit "A."  This copy is a true, correct and substantial copy of the lost or destroyed Note.

FURTHER AFFIANT SAYETH NAUGHT.

Sign: _____

Date: 8/22/12 _____

**WELLS FARGO BANK, N.A.**


Jason Ringquist

On this 22 day of A-g-ST , 2012, before me appeared _____,
to me personally known, who being duly sworn did say that she/he is the <u>Vice President Loan Documentation</u>
of **WELLS FARGO BANK, N.A.**, a national banking association, and that said Lost **NOTE** Affidavit was
signed and sealed on behalf of such association defined in this document as Servicer and said association
acknowledged this instrument to be the free act and deed of said association.

Shane Stutzman _____



Notary Public,

State of <u>Minnesota</u>

My Commission expires: ___1-31-17___

SHANE A. STUTZMAN
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2017


Loan Number: ████████████

Jason Ringquist

SHANE A. STUTZMAN
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2017

## EXHIBIT B

Return To:
SouthTrust Mortgage
Corporation
210 Wildwood Parkway, Suite
100
Birmingham, AL  35209

BK1401  PG216

BK:01401 PG:00216
07/28/2003  04:39:28PM
Billie O. McLeod, Register of Deeds
Kershaw County SC
REC FEE:22.00

Prepared By:
Stephanie Gaddy
10130 Mallard Creek Road
Suite 200
Charlotte, NC  28262

Charles V.B. Cushman, III PC
PO Box 2222
Camden, SC 29020

————————————[Space Above This Line For Recording Data]————————————

# MORTGAGE

MIN

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  July 21, 2003
together with all Riders to this document.
(B) "Borrower" is Nicholas Torchia, Ruth Torchia, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

SOUTH CAROLINA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS  Form 3041  1/01

-6A(SC) (0005).01
Page 1 of 15                    Initials:
VMP MORTGAGE FORMS - (800)521-7291

FILED FOR RECORD 07/28/2003
AT 04:39P  BOOK 01401  PAGE 00216
Billie O. McLeod -Reg of Deeds - RMC
Kershaw County Government Ctr

**BK1401 PG217**

(D) "Lender" is SouthTrust Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of The State of Delaware
Lender's address is 210 Wildwood Parkway, Suite 100, Birmingham, AL  35209

(E) "Note" means the promissory note signed by Borrower and dated July 21, 2003
The Note states that Borrower owes Lender Three Hundred Thousand  And Zero/100
Dollars
(U.S. $300,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than August 01, 2033
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used



 BK1401 PG218

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

County                     of                **Kershaw**                :

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

Parcel ID Number:                                    which currently has the address of
**11 Hunt Cup Lane**                                                                       [Street]
**Camden**                                  [City] , South Carolina **29020**         [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns,) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

 -6A(SC) (0005).01          Page 3 of 15          Initials: [signature]          Form 3041  1/01



THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be



BK1401 PG220

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the




 BK1401 PG221

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with




BK1401 PG222

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



-6A(SC) (0005).01                    Page 7 of 15                    Initials: [signature]                    Form 3041    1/01



BK1401 PG223

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.




-6A(SC) (0005).01                Page 8 of 15                Initials:         Form 3041   1/01

BK1401 PG224

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



-6A(SC) (0005).01

Initials: 



Form 3041   1/01

BK1401 PG225

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



-6A(SC) (0005).01

Page 10 of 16

Initials: _____

Form 3041    1/01



BK1401 PG226

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA




 BK1401 PG227

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.





BK1401 PG228

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the · date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence, all of which shall be additional sums secured by this Security Instrument.

23. **Release.** Upon Payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall release this Security Instrument. Borrower shall by any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Homestead Waiver.** Borrower waives all rights of homestead exemption in the Property to the extent allowed by Applicable Law.

25. **Waiver of Appraisal Rights.** The laws of South Carolina provide that in any real estate foreclosure proceeding a defendant against whom a personal judgment is taken or asked may within 30 days after the sale of the mortgaged property apply to the court for an order of appraisal. The statutory appraisal value as approved by the court would be substituted for the high bid and may decrease the amount of any deficiency owing in connection with the transaction. TO THE EXTENT PERMITTED BY LAW, THE UNDERSIGNED HEREBY WAIVES AND RELINQUISHES THE STATUTORY APPRAISAL RIGHTS WHICH MEANS THE HIGH BID AT THE JUDICIAL FORECLOSURE SALE WILL BE APPLIED TO THE DEBT REGARDLESS OF ANY APPRAISED VALUE OF THE MORTGAGED PROPERTY. This waiver shall not apply so long as the Property is used as a dwelling place as defined in Section 12-37-250 of the South Carolina Code of Laws.

26. **Future Advances.** The lien of this Security Instrument shall secure the existing indebtedness under the Note and any future advances made under this Security Instrument up to 150% of the original principal amount of the Note plus interest thereon, attorneys' fees and court costs.





-6A(SC) (0005).01                                Page 13 of 15                        Initials:        Form 3041  1/01



BK1401 PG229

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Heuther norg_ _____     _Nicholas Torchia_ _____ (Seal)
                                             Nicholas Torchia               -Borrower

_____     _Ruth Torchia_ _____ (Seal)
                                             Ruth Torchia                     -Borrower

_____ (Seal)     _____ (Seal)
                             -Borrower                                         -Borrower

_____ (Seal)     _____ (Seal)
                             -Borrower                                         -Borrower

_____ (Seal)     _____ (Seal)
                             -Borrower                                         -Borrower


VMP-6A(SC) (0005).01          Page 14 of 15          
                                                      Form 3041  1/01

 BK1401 PG230

**STATE OF SOUTH CAROLINA,**
County of KERSHAW

    Personally appeared before me *Heather Morgan*
and made oath that he/she saw the within named Borrower sign, seal, and as his/her/their act and deed,
deliver the within written Mortgage; and that he/she with *Charles VB Cushman III*
, witnessed the execution thereof.

_____

    Sworn to before me this 21st    day of July, 2003

My Commission Expires:

_____
Notary Public for South Carolina



-6A(SC) (0005).01           Page 15 of 15    Initials:        Form 3041   1/01

 BK1401 PG231

Property Description for Ruth A. Torchia:

11 Hunt Cup Lane, Camden, SC 29020

All that piece, parcel or lot of land, with improvements thereon, known as Lot 6, Block "A" of Springdale Close, lying, being and situate in the State of South Carolina, County of Kershaw, City of Camden, on the Northwest side of Hunt Cup Lane; containing 1.291 acres, more or less, and being bound as follows: on the NORTHEAST by Lot 7, Block "A", on the SOUTHEAST by Hunt Cup Lane; on the SOUTHWEST by Lot 5, Block "A", and on the NORTHWEST by property now or formerly of the State of South Carolina.

The above described property is more particularly shown as Lot 6, Block "A", of Springdale Close, on that plat prepared for Nicholas A. Torchia and Ruth A. Torchia by J. Henry Walker, III, P.L.S., dated January 23, 1996 and recorded in the Office of the Clerk of Court for Kershaw County in Book A-62, at page 9.

Said lands are subject to the Declaration of Land Use Restrictions, dated July 11, 1977, with amendments thereto dated April 7, 1978, all recorded in the Office of the Clerk of Court for Kershaw County in Deed Book IJ, at page 742.

The above described property is the same as that conveyed to Ruth A. Torchia by deed of Nicholas A. Torchia dated October 20, 1998 and recorded in the office of the Clerk of Court for Kershaw County in Book 689, at page 152.

Tax Map Number: 

# NOTE

| July 21, 2003 | CAMDEN | SOUTH CAROLINA |
|---|---|---|
| [Date] | [City] | [State] |

11 Hunt Cup Lane, Camden, SC  29020

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 300,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is SouthTrust Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       4.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st       day of each month beginning on September 01, 2003     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 01, 2033      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 210 Wildwood Parkway, Birmingham, AL  35209

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,587.63

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

41016675                                                                                          41016675

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0005).02        Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3        Initials:

THIS IS TO CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL DOCUMENT.
WELLS FARGO BANK, N.A.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

41016675                                                                                      41016675

Form 3200 1/01

VMP ®-5N (0005).02                                      Page 2 of 3                                Initials



**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Nicholas Torchia                   -Borrower       Ruth Torchia                      -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                         -Borrower

*[Sign Original Only]*

41016675                                                          41016675

-5N (00051.02)                     Page 3 of 3                    Form 3200 1/01



**EXHIBIT C**

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

DEFAULT ASSIGNMENT
WELLS FARGO BANK, N.A.
MAC: X9999-018
PO BOX 1629
MINNEAPOLIS, MN  55440-9790



Filed for Record in
KERSHAW COUNTY SC
BILLIE MCLEOD, REGISTER,
12-12-2011 At 11:28:52 am.
ASSIGNMENT        7.00
OR Volume  2874 Page  192 - 193

| Instrument | OR | Volume | Page |
|---|---|---|---|
|  |  | 2874 | 192 |

## CORPORATE ASSIGNMENT OF MORTGAGE

Kershaw, South Carolina
"TORCHIA"
INVESTOR'S LOAN
POOL #:
OLD SERVICING #:

MERS #                      SIS #: 1-888-679-6377

Date of Assignment: December 2nd, 2011
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR SOUTHTRUST
MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS at BOX 2026 FLINT MI 48501, 1901 E
VOORHEES ST STE C., DANVILLE, IL 61834
Assignee: WELLS FARGO BANK, NA at 1 HOME CAMPUS, DES MOINES, IA  50328

Executed By: NICHOLAS  TORCHIA, RUTH  TORCHIA, HUSBAND AND WIFE  To: MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., AS NOMINEE FOR SOUTHTRUST MORTGAGE CORPORATION, ITS
SUCCESSORS AND ASSIGNS
Date of Mortgage:  07/21/2003 Recorded:  07/28/2003  in Book/Reel/Liber: 1401 Page/Folio: 216 as Instrument No.:
In the County of Kershaw, State of South Carolina.

Property Address: 11 HUNT CUP LANE, CAMDEN, SC  29020

    KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $30,000.00 with interest, secured thereby, with all moneys now owing
or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the
covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee,
the Assignor's beneficial interest under the Mortgage.

    TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR SOUTHTRUST MORTGAGE
CORPORATION, ITS SUCCESSORS AND ASSIGNS
On 12-02-2011

By:
Gaoaong Vang
Assistant  Secretary

WITNESS                                                WITNESS

Matthew F. Ryan                                       Julie Ann Prieto

Instrument                    Volume Page
                          OR        2874   193

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Minnesota
COUNTY OF Dakota

_Angela Marie Williams_

On _12-8-11_, before me, _____, a Notary Public in Dakota County in the
State of Minnesota, personally appeared _____Gaoaong Vang_____, Assistant Secretary, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Angela Marie Williams_
Notary Expires: _1/31/2012_

ANGELA MARIE WILLIAMS
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2012

(This area for notarial seal)



Instrument       Volume Page
OR       3761   35

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

ASSIGNMENT TEAM
WELLS FARGO BANK, N.A.
1000 BLUE GENTIAN RD #200
MAC: N9289-018
EAGAN, MN 55121-4400

Filed for Record in
KERSHAW COUNTY SC
BILLIE MCLEOD, REGISTER
10-05-2017 At 10:44:26 am.
ASSIGNMENT          6.00
OR Volume   3761 Page  35 -   35

## CORPORATE ASSIGNMENT OF MORTGAGE

Kershaw, South Carolina
"TORCHIA"

Date of Assignment: September 26th, 2017
Assignor: WELLS FARGO BANK, N.A. at 1 HOME CAMPUS, DES MOINES, IA 50328
Assignee: US BANK TRUST,N.A. AS TRUSTEE OF THE IGLOO SERIES III TRUST at 7114 E. STETSON DR.,
SUITE 250, SCOTTSDALE, AZ 85251

Executed By: NICHOLAS TORCHIA, RUTH TORCHIA, HUSBAND AND WIFE  To: MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., AS NOMINEE FOR SOUTHTRUST MORTGAGE CORPORATION, ITS
SUCCESSORS AND ASSIGNS
Date of Mortgage: 07/21/2003 Recorded: 07/28/2003 in Book/Reel/Liber: 1401 Page/Folio: 216 as Instrument No.:
8899 In the County of Kershaw, State of South Carolina.

Property Address: 11 HUNT CUP LANE, CAMDEN, SC 29020

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $300,000.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

WELLS FARGO BANK, N.A.
On _9/26/17_

By: _Marvin Weidner_
Marvin Weidner
Vice President Loan Documentation

WITNESS                                              WITNESS

_Joy Kenneth Sandahl_                                _Juliane M. Christensen_
Joy Kenneth Sandahl                                  Juliane M. Christensen

STATE OF Minnesota
COUNTY OF Dakota

On _9/26/17_ , before me, _Dereje D. Badada_ , a Notary Public in the State of
Minnesota, personally appeared _Marvin Weidner_ Vice President Loan Documentation of
WELLS FARGO BANK, N.A., personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Dereje D. Badada_
Dereje D. Badada
Notary Expires: _1/31/22_

DEREJE D BADADA
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 1/31/22

(This area for notarial seal)

PREPARED BY: WELLS FARGO BANK, N.A.

EXHIBIT D

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):[1] **Nicholas Torchia and Ruth Torchia**
Lender or Servicer ("Lender"): **Wells Fargo Home Mortgage**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **07/21/2003**
Loan Number: ▮▮▮▮▮▮▮▮
Property Address ("Property"): **11 HUNT CUP LN  CAMDEN, SC 29020-2163**



"MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under the Mortgage.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

If my representations in Section 1, Borrower Representations, continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.  The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents."  Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement.  This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **Borrower Representations.**

    I certify, represent to Lender and agree:

    A.  I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I certify the Property is not condemned and is not vacant without the intent to either re-occupy or rent;

    C.  There has been no impermissible change in the ownership of the Property since I signed the Loan Documents;

    D.  I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.  Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.  If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and,

    G.  I have made or will make all payments required within this modification process.

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I."  For purposes of this document words signifying the singular (such as "I" or "my") shall include the plural (such as "we" or "our") and vice versa where appropriate.

**2. Acknowledgements and Preconditions to Modification.**

I understand and acknowledge that:

A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and,

B. I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

C. If included, the undersigned borrower(s) acknowledges receipt and acceptance of the Notice of Special Flood Hazard disclosure.

3. **The Modification**.

If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **January 01, 2016** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a Mortgage Assistance or trial period plan, this modification will not take effect. The first modified payment will be due on **February 01, 2016**.

A. The new Maturity Date will be: **August 01, 2033**.

B. The modified principal balance of my Note will include amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, valuation, property preservation, and other charges not permitted under the terms of the HAMP modification, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$235,229.44** (the "New Principal Balance") I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. Interest at the rate of **2.625%** will begin to accrue on the New Principal Balance as of **January 01, 2016** and the first new monthly payment on the New Principal Balance will be due on **February 01, 2016** Interest due on each monthly payment will be calculated by multiplying the New Principal Balance and the interest rate in effect at the time of calculation and dividing the result by twelve (12). My payment schedule for the modified Loan is as follows:

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On |
|--------|---------------|---------------------------|----------------------------------------|-------------------------------|------------------------|-------------------|
| 60 | 2.625% | 01/01/2016 | $1,393.03 | $577.02 | $1,970.05 | 02/01/2016 |
| 12 | 3.625% | 01/01/2021 | $1,477.80 | $577.02 | $2,054.82 | 02/01/2021 |
| 139 | 4.000% | 01/01/2022 | $1,507.99 | $577.02 | $2,085.01 | 02/01/2022 |

**\*This includes an escrow shortage amount to be paid over the first 60 month term. After your modification is complete, escrow payments adjust at least annually in accordance with applicable law therefore, the total monthly payment may change accordingly.**

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

## 4. Additional Agreements.

I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Mortgage Assistance that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

E.  **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents;   (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.E. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.E.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

F.  That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.  That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

J.  That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

K.  That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

L.  That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

M.  Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

N.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

O.  I agree, that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.O. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

P.  That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

Q.  CORRECTION AGREEMENT: The undersigned Borrower(s), for and in consideration of the approval, closing and funding of this Modification, hereby grants **Wells Fargo Home Mortgage**, as lender, limited power of attorney to correct and/or initial all typographical or clerical errors discovered in the Modification Agreement required to be signed. In the event this limited power of attorney is exercised, the undersigned will be notified and receive a copy of the document executed or initialed on their behalf. This provision may not be used to modify the interest rate, modify the term, modify the outstanding principal balance or modify the undersigned's monthly principal and interest payments as modified by this Agreement. Any of these specified changes must be executed directly by the undersigned. This limited power of attorney shall automatically terminate in 120 days from the closing date of the undersigned's Modification.

R.  If the mortgage is a biweekly mortgage with payments due every two weeks, through the attached modification agreement, the Loan will convert to a MONTHLY payment schedule.  To accommodate monthly payments, interest will be charged based on a 12 month year and a 30 day month. As part of the conversion from biweekly to monthly payments, any automatic withdrawal of payments (auto drafting) in effect with Lender for the Loan is cancelled. Complete the enclosed Automatic Loan Payment Authorization form to establish automatic payment drafting.

S.  If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit and if so, I confirm and acknowledge that no additional advances may be obtained.)

T.  By signing this Agreement the Borrower hereby consents to being contacted concerning their loan at any cellular or mobile telephone number they may have.  This includes text messages and telephone calls including the use of automated dialing systems to contact any cellular or mobile telephone.  The Borrower may be billed by the cellular or mobile carrier for any text messages that Lender may send.  Any calls Lender places to the Borrower's cellular or mobile phone may incur normal airtime charges assessed by the mobile carrier.

All Borrowers are required to sign and date this Agreement in blue or black ink only as your name appears below.  If signed using any other color or method, the document will not be accepted and another copy of the Agreement will be sent to you to be signed.

By signing below, all Borrowers certify they have read this Agreement in its entirety, that all Borrowers know and understand the meaning and intent of this Agreement and that all Borrowers enter into this Agreement knowingly and voluntarily.  By signing below, all Borrowers agree to all terms and conditions described on every page of this Agreement.

_____          _____(Seal)
Wells Fargo Bank, N.A.                              Nicholas Torchia

                                                            12/29/2013
                                                            Date

By:_____          _____(Seal)
                                                            Ruth Torchia

_____          12/29/2013
Date                                                     Date

**MERS**

_____
Mortgage Electronic Registration Systems, Inc. - Nominee for Lender

**For use only if the Borrower is a revocable trust:**

If the Borrower(s) is/are a revocable trust, each trustee must complete and sign the section below. If the Borrower(s) is/are not a revocable trust, this section should be left blank.

_____                    _____
(Trustee 1 Signature)                                        (Trustee 2 Signature)

_____                    _____
(Trustee 3 Signature)                                        (Trustee 4 Signature)

Trustee(s) of the _____ Trust under trust instrument dated _____, for the benefit of the
                         (Name of trust)                                    (Date of trust)

Borrower(s):

_____                    _____
(Borrower 1 Signature)                                     (Borrower 2 Signature)

_____                    _____
(Borrower 3 Signature)                                     (Borrower 4 Signature)

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. ©2015 Wells Fargo Bank, N. A. All rights reserved. NMLSR ID 399801

_____[Space   Below   This   Line   For   Acknowledgement]_____

RECORDING REQUESTED BY:
BSI Financial Services
314 S. Franklin Street
Titusville, PA  16354

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## LIMITED POWER OF ATTORNEY

**Igloo Series III Trust ("Trust")**, by and through **U.S. Bank Trust National Association**, a national banking association organized and existing under the laws of the United States and having an office at 190 S. La Salle Street, MK-IL-SL7R, Chicago, IL 60603, not in its individual capacity but solely as Trustee ("Trustee"), hereby constitutes and appoints Servis One, Inc. d/b/a BSI Financial Services, ("Servicer"), and in its name, aforesaid Attorney-In-Fact, by and through any officer appointed by the Board of Directors of Servicer, to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described in the items (1) through (12) below; provided however, that (a) the documents described below may only be executed and delivered by such Attorneys-In-Fact if such documents are required or permitted under the terms of the Trust Agreement dated as of April 27, 2017, between Preston Ridge Partners III, LLC as Depositor and Administrator, and U.S. Bank Trust National Association, as Trustee, for Bungalow Series F Trust, (b) all actions taken by Servicer pursuant to this Limited Power of Attorney must be in accordance with Federal, State and local laws and procedures, as applicable and (c) no power is granted hereunder to take any action that would be either adverse to the interests of or be in the name of U.S. Bank National Association in its individual capacity.  This Limited Power of Attorney is being issued in connection with Servicer's responsibilities to service certain mortgage loans (the "Loans") held by U.S. Bank Trust National Association, as Trustee for the above referenced Trust.  These Loans are comprised of Mortgages, Deeds of Trust, Deeds to Secure Debt and other forms of Security instruments (collectively the "Security Instruments") encumbering any and all real and personal property delineated therein (the "Property") and the Notes secured thereby.

1. Demand, sue for, recover, collect and receive each and every sum of money, debt, account and interest (which now is, or hereafter shall become due and payable) belonging to or claimed by the Trustee, and to use or take any lawful means for recovery by legal process or otherwise, including but not limited to the substitution of trustee serving under a Deed of Trust, the preparation and issuance of statements of breach, notices of default, and/or notices of sale, accepting deeds in lieu of foreclosure, evicting (to the extent allowed by federal, state or local laws) foreclosing on the properties under the Security Instruments by judicial or non-judicial foreclosure, actions for temporary restraining orders, injunctions, appointments of receiver, suits for waste, fraud and any and all other tort, contractual or

verifications in support thereof, as may be necessary or advisable in any bankruptcy action, state or federal suit or any other action.

2.   Execute and/or file such documents and take such other action as is proper and necessary to defend the Trustee in litigation and to resolve any litigation where the Servicer has an obligation to defend the Trustee, including but not limited to dismissal, termination, cancellation, rescission and settlement.

3.   Transact business of any kind regarding the Loans, as the Trustee's act and deed, to contract for, purchase, receive and take possession and evidence of title in and to the Property and/or to secure payment of a promissory note or performance of any obligation or agreement relating thereto.

4.   Execute, complete, indorse or file bonds, notes, mortgages, deeds of trust and other contracts, agreements and instruments regarding the Borrowers ("Borrowers") and/or the Property ("Property") associated with each of the Loans, including but not limited to the execution of estoppel certificates, financing statements, continuation statements, releases, satisfactions, assignments, loan modification agreements, payment plans, waivers, consents, amendments, forbearance agreements, loan assumption agreements, subordination agreements, property adjustment agreements, management agreements, listing agreements, lien releases and other documents necessary to effectuate the short sale of a property secured by a Mortgage or Deed of Trust, a deed in lieu of foreclosure or related documents to facilitate the acceptance of a deed in lieu of foreclosure, purchase and sale agreements and other instruments pertaining to mortgages or deeds of trust, and execution of deeds and associated instruments, if any, conveying the Property, in the interest of the Trustee.

5.   Endorse on behalf of the undersigned all checks, drafts and/or other negotiable instruments made payable to the undersigned.

6.   Execute any document or perform any act in connection with the administration of any PMI policy or LPMI policy, hazard or other insurance claim relative to the Loans or related Property.

7.   Execute any document or perform any act described in items (3), (4), and (5) in connection with the termination of any Trust as necessary to transfer ownership of the affected Loans to the entity (or its designee or assignee) possessing the right to obtain ownership of the Loans.

8.   Subordinate the lien of a mortgage, deed of trust, or deed to secure debt (i) for the purpose of refinancing Loans, where applicable, or (ii) to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain, including but not limited to the execution of partial satisfactions and releases and partial re-conveyances reasonably required for such purpose, and the execution or requests to the trustees to accomplish the same.

9.   Convey the Property to the mortgage insurer, or close the title to the Property to be acquired as real estate owned, or convey title to real estate owned property ("REO Property").

10. Execute and deliver any documentation with respect to the sale, maintenance, preservation, renovation, repair, demolition or other disposition, of REO Property acquired through a foreclosure or deed-in-lieu of foreclosure, including, without limitation: permits, remediation plans or agreements, certifications, compliance certificates, health and safety certifications, listing agreements; purchase and sale agreements; grant / limited or special warranty / quit claim deeds or any other deed, but not general warranty deeds, causing the transfer of title of the property to a party contracted to purchase same; escrow instructions; and any and all documents necessary to effect the transfer of REO Property.

11. Execute and deliver Limited Powers of Attorney in order to further delegate the authority granted under this Limited Power of Attorney for the purpose of effectuating Servicer's duties and responsibilities under the related trust agreements.

12. To execute, record, file and/or deliver any and all documents of any kind for the purpose of fulfilling any servicing duties, including but not limited to those listed in subparagraphs (1) through (11), above, where Trustee's interest is designated, stated, characterized as or includes any reference to one or more of the following: "Delaware Trustee", "Indenture Trustee", "Owner Trustee", "Successor Trustee", "Successor in Interest", "Successor to" "Successor by Merger", "Trustee/Custodian", "Custodian/Trustee" or other similar designation.

Trustee also grants Servicer the full power and authority to correct minor ambiguities and errors in documents necessary to effect items (1) through (12) above.

In addition to the indemnification provisions set forth in the applicable servicing agreement for the Trust, Servicer hereby agrees to indemnify and hold the Trustee, and its directors, officers, employees and agents harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of the misuse of this Limited Power of Attorney by the Servicer. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the related servicing agreements or the earlier resignation or removal of the Trustee.

Witness my hand and seal this 12th day of July, 2017.

NO CORPORATE SEAL

Igloo Series III Trust by
U.S. Bank Trust National Association,
as Trustee

Witness: Millard F. Southern

By: _____
Jose A. Galarza, Vice President

Witness: Edward W. Przybycien Jr.

By: _____
April E. Lancsak, Vice President

Attest: Erika A. Forshtay, Assistant Vice President

Document drafted by U.S. Bank Trust
National Association, as Trustee

## CORPORATE ACKNOWLEDGMENT

State of Illinois

County of Cook

On this 12th day of July, 2017, before me, the undersigned, a Notary Public in and for said County and State, personally appeared Jose A. Galarza, April E. Lancsak and Erika A. Forshtay personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument as Vice President, Vice President, and Assistant Vice President, respectively of U.S. Bank Trust National Association, a national banking association, and acknowledged to me that such national banking association executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

Signature: _____
            Christopher J. Nuxoll

My commission expires: 4/15/2018

OFFICIAL SEAL
CHRISTOPHER J NUXOLL
Notary Public · State of Illinois
My Commission Expires Apr 15, 2018